Good morning. On behalf of Deborah Cornwell and myself, it is our honor to be here today representing the plaintiff appellant, in this case, Mr. Herman Atkins. It's hard for me to see him because there's all that glare over there. I'll take my representation. I'll accept it. One fact that's not in dispute in this case is that Herman Atkins, a completely innocent man, was wrongly convicted for a crime he did not commit in 1988, a rape in Riverside County. It is undisputed in this case that post-conviction DNA testing in 2000 led to his complete exoneration. What we also know now about these wrongful conviction cases is that they are not simply an act of God. They are not random coincidences. Rather, we know that many of these cases, particularly this one, arise because of specific misconduct committed by either police officers or criminalists, or in this case, both. Perhaps one of the best ways to appreciate the evidence that was relied upon to get a conviction in this case can be gleaned from a letter written by the prosecutor before there was any civil rights lawsuit in this case. And in that letter, shortly after the DNA exonerated Mr. Atkins, he wrote, to whom it may concern, that, of course, there were three significant things which led to this conviction. There was the eyewitness testimony. There was the fact, and I quote, that when first contacted by detectives on this case, Mr. Atkins was wearing the distinctive black leather running shoes with the red and white flag on the side identified by the rape victim. And third, there was the serology evidence. And the serology evidence played a big role in this case. So those were the three major pieces of evidence that led to his conviction. Unfortunately, what we now know through the insight afforded us because of the DNA testing and the investigation that we followed up with and the filing of this lawsuit and the discovery which ensued, is that two of those items that were relied upon by the jury turned out to be false, turned out to be fabricated, turned out to be – would have been completely neutralized had the officers and criminalists complied with their Brady obligations. And the third, namely the eyewitness identification, was the product of unduly suggestive activity on the part of a law enforcement officer. Now, the problem in this case is that the lower court simply failed to comply with the rules for summary judgment. He failed to consider evidence actually proffered by a plaintiff during this discovery process. He failed to draw reasonable inferences in favor of the plaintiff. And at some point, when faced with competing facts, he resolved them in favor of the defendant. The best example of this, and what we submit is the smoking gun, is in that very letter dated May 4, 2000, signed by the prosecutor, Mr. Bentley. In response to the judge's ruling, the judge ruled on the summary judgment motion, quote, there is no evidence that Hall told Bentley – Hall was a serologist working for the California Department of Justice Crime Laboratory in the same building as the Riverside County Sheriff's Department – there is no evidence that Hall told Bentley that only 4.4 percent of the black male population could have contributed the semen found on Kelly M's sweater, unquote. That's the decision and observation by the trial court. Judge Anderson here. In the letter written before this lawsuit started, Mr. Bentley says, and I quote, serology was the only scientific technique available for purposes of this trial. As explained to me by the Department of Justice expert referring to Hall, these serology findings excluded 95 percent of the population, but did not exclude Mr. Atkins. Not only did these findings corroborate the evidence against Mr. Atkins, but he had also made some implausible statements at trial. And then he talks about a jury of 12 unanimously found him guilty. What was the occasion of that letter? To whom it may concern or something? Well, it says to whom it may concern. During the deposition, we learned that in the wake of Mr. Atkins' exoneration, he was approached by a number of reporters. What happened? How did an innocent person get convicted? And so he went back over his files, and he wrote this letter to the press to justify – excuse me? Which prosecutor is it that signed it? Mr. Bentley, the trial assistant who actually prosecuted the case. All right. Okay? Now, how could there be no evidence when the prosecutor says that as explained to me – he didn't say as testified at trial, but as explained to me by the criminalist. Hall admits that prior to trial, he met with the prosecutor and explained the statistics. The criminalist Hall admits that the only statistic that's relevant, pertinent, in any sexual assault prosecution is the population of potential semen donors. After all, this is a sexual assault case. And when you find a stain, either in the rape kit or in this case, if just to bring it to the court's attention because it's a very important point here, in this instance, the rapist – it's a cross-racial ID – the rapist comes into the shoe store and forces the victim to remove her sweater, then forces her to orally copulate with him, and then to have vaginal intercourse. And when it's done, he then takes her sweater and he wipes himself off in his genital area, depositing both the semen, the saliva, and some of his pubic hairs on her sweater. And so the criminalists arrive at the crime scene. The detective, Deputy Sheriff Miller, arrives at the crime scene. They see the hair. They see the semen on the sweater. They photograph the hair and the semen on the sweater. In fact, it's attached as an exhibit for you folks. And you can see, even though you have a Xerox copy, the hair sitting there in plain view. And everyone knows that in that situation, serology testing is critically important. And everyone knows, including Mr. Hall, including our experts, okay, that given the serology data in this case, that no one could be excluded, that the population was not only 5 percent of possible donors, one of whom could have been Herman Atkins, but in fact, and there's no dispute of this in the case, the population of potential donors was 100 percent of the male population. In other words, the serology evidence in this case had zero inculpatory value. However, notwithstanding that fact, Hall fabricated a police report, which he turned over to the district attorney a year before trial, in which he claimed in that report that the serology findings had significant inculpatory value. He exacerbated that first fabrication by meeting with the district attorney before trial and preparing a chart for the district attorney, because he knew that the issue would come up in the meeting about how valuable this evidence was. And during that meeting, he gave him a chart. And in that chart, it said that in the white population, you would only see this particular profile in 6 percent, but in the black population, you'd only see it in 4.4 percent. That chart, I gather, is in the record, right? All in the record, every bit of it. But so the first problem we had was that the judge simply ignored evidence that was presented to him. He ignored the fact that we had three, not one, but three different experts, an expert on the identification procedures, an expert on the hair evidence, an expert on the serology. And no experts were retained by the defendants in this case, but he simply ignored the reports of all three of our experts. When this Court has held, I think, in the Thomas case, that the conclusions of one expert alone can raise a disputed fact that warrants a trial. He ignored the testimony of Hall's own supervisors and the head of the Department of Justice for the State of California's Crime Laboratory, who said, if what Bentley says in his letter is true, then Hall committed scientific fraud. Now, certainly, later on, after the litigation begins, and Bentley is deposed and has an interest in protecting somebody from the California Department of Justice who has made many cases for them, he says, all right, I didn't mean that in the letter. But which is the best evidence of what he actually meant, what he says explicitly in this letter before there's a lawsuit or what he says later on? And, frankly, it doesn't matter because it's a disputed fact and a jury should decide that, not a judge deciding a summary judgment motion. And that's not all. He ignored the fact that Milner admitted during the deposition that based on these two flaky identifications, which was just based on a single photograph, he didn't think they were reliable. He didn't think he had enough to make an arrest. And the reason he didn't think he had enough to make an arrest is that when he looked up Herman Atkins' background, he never had a sexual assault case. When he looked up Herman Atkins' background, there was no nexus between Herman Atkins, who comes from south-central Los Angeles, and Riverside County, much less like Elsinore, where this crime occurred. And he knew he needed to find a nexus, and so he did. He fabricated a statement from a man named Ingram, who claimed falsely that Ingram said that he had seen Herman Atkins in Riverside County, particularly in the town of Paris, on the week when this crime occurred. We didn't know who this guy Ingram was. We hired a detective when we saw the civil suit. He found this person named Ingram. Ingram gave us an affidavit saying he never knew Atkins, he never saw Atkins before, and he never said that to Detective Miller, that all those statements were a lie. So that affidavit itself creates a disputed fact that should be decided by a jury. But, nevertheless, Your theory on this is it wasn't introduced at trial, so your theory is it's precipitated at trial, is that correct? Well, you know, Devereaux, this Court said in Devereaux, for instance, that it would be a denial of due process under the 14th Amendment to even profit charges against somebody based on fabricated evidence. So I think as to the Atkins statement, even without it actually being used at the trial, we satisfy the criteria established by this Court in Devereaux. But there's additional evidence like that that he not only did he ignore evidence, okay, but he refused to draw any inferences consistent with plaintiff's factual submissions in the case. One of the best is that he said specifically, referring to this allegation that Miller had a Brady obligation to disclose to a district attorney that, in fact, when he showed these unusual sneakers that he described in that letter in May 2000, okay, that when he showed those sneakers to the victim, she said she didn't recognize them as those worn by the rapist. Okay? That's an obligation that he would have, clearly, under Brady, if he had shown them to her. And what I did during... But where is the... I remember somebody saying that they didn't remember whether they said, and I remember somebody saying she didn't identify them. Is there... Right. What happened is exactly this. If you go back and look at my deposition of Miller, okay, the following occurs. Number one, he concedes that the reason he sought a search warrant to seize the sneakers off Herman Atkins in the jail when he arrested them and the ring is because when he looked at them, they strongly resembled or, you know, what the victim had told him the assailant wore on the day in question. And he said in the deposition that the reason I seized them, which he did, was to take them to the victim's home, to show them to the victim, and get a positive ID. That's what his expectation was. He then admits in the deposition that he, in fact, did show the items to the victim. Now, if he doesn't remember, he says he did show them to the victim. Okay? He then says that it would have been his normal practice that had she affirmatively recognized them or identified them as the shoes worn by the person. By the way, this is a woman who's the manager of a shoe store, so her ability to identify shoes might be better than a lot of other people's. But nevertheless, he said that had she affirmatively identified them, he would have reduced that and written it into his report. He then went on to say in the deposition, when faced with the reality that there's nothing in his reports affirmatively saying that she recognized those shoes or that ring, he agreed, he agreed that that alone is evidence that she must have not recognized them when shown them. Now, what's so extraordinary about that is that those are a number of facts that we proved during the discovery process. And all we're asking the court to do at that point is draw the permissible inference that given all those stages, that that is evidence that, in fact, when she was shown the shoes, she said those aren't the shoes. Okay? She didn't recognize them. The judge refused to do that, simply saying that evidence of absence is not enough, doesn't get you anywhere. And that's not true. In a summary judgment context, he's required to draw inferences if we present some evidence to support that inference. And that wasn't done. Another instance where he refused to draw inferences based on the evidence had to do with the hair. And the hair in this case is critically important, because we made the argument, either in the context of Arizona v. Youngblood, that the hair was clearly exculpatory evidence. The hair, this is the hair that stuck to the semen on the sweater after the assailant wiped himself off after the rape. Okay? Either it is clearly exculpatory evidence and should have been handled as a Brady violation, or the alternative. If you want to give them every benefit of the doubt, worst-case scenario, if you show bad faith, okay, there's a constitutional violation under Arizona v. Youngblood. Well, we're entitled again to inferences in a summary judgment setting. And the inference we're entitled to flows from the following facts. Number one, it is absolutely undisputed by Miller, by the criminalist, by the photograph, and by a report written by Miller saying to the criminalist, I want you to examine the semen and pubic hair on this sweater. The photograph shows the pubic hair. Both of them looked at the photograph and said, yeah, that's the pubic hair on the sweater. They both said that. Given all that, given the fact that Hall says it was the protocol that every time I examine an item of evidence, particularly an item I'm specifically requested to examine for something specific as hair, I must look at that item, and if I don't see hair, I must explicitly write down on the report, I don't see hair or no hair seen. For the other items of evidence he inspected, he wrote down no hair, no hair observed. But for the one item of evidence where the police specifically saw it, and there's no question, by the way, that the hair was in the bag with the sweater, with the semen at the moment that Hall opened it up, because the chain of custody in this case is absolutely crystal clear, then we are entitled to the fact, since he departed from his own protocols, from there is this expectation that it would be there, because the chain of custody is correct, and because he fabricated evidence in the serology part of this case, and because he failed to disclose to the prosecutor the true non-probative value of that serology evidence, that's enough to create an inference of bad faith, at least an inference that gets us to a jury. But he refused to consider any of those factors as well. So that's to begin with where I believe the district court went wrong on this case. Furthermore, they went wrong because they had, they misstated what is the appropriate test for assessing fabrication, a fabrication claim under the due process clause. This court correctly ruled in Devereaux that you can state a claim in a civil rights lawsuit for fabrication of evidence, and there's no question that would be clearly established. We've known forever in the history of Anglo-Saxon law that you can't fabricate a piece of evidence to get a conviction, and we also know that you can't fabricate a piece of evidence even if you believe a guy is guilty. But where he went wrong was in Devereaux, they then laid out what is the best way to assess whether there's a fabrication when the type of evidence involves questioning of witnesses, and Devereaux was questioning child witnesses. And the court specifically said you'd have to show one of two things. Either the police officers knew or should have known that the suspect was actually innocent, or an alternative, you'd have to show that the police officers used coercive and abusive tactics with the witness. Okay? That's fine. That's fine for child witnesses, but that has nothing to do with other kinds of fabrication. If a police officer chooses to plant a gun on somebody and then tell the district attorney, I found the gun on him, there is no abusive, okay, or coercive behavior with a witness. In this case, when Hall, knowing better, claims that serology evidence, which has no probative value, can exclude 95 percent of the population, but includes Herman Atkins and puts that in a report, or discusses that with the district attorney at a meeting in his office and prepares a chart to make out that point, that's a fabrication. I don't have to show that Hall was abusive toward a witness. I make out a clear fabrication, as we all know fabrication to be. One of the leading cases on fabrication is Miller v. Pate, I think from the 1950s, U.S. Supreme Court. There's no coercion of a witness in that case. What happened was they had a pair of shorts, and they misrepresented to the jury, okay, the investigator, and then the DA misrepresented to the jury that those shorts, that the red stains on those shorts were blood. In fact, they were paint. And the U.S. Supreme Court said that's a fabrication of evidence. Well, that's what we have here. You know, there is a problem all over this country right now where criminalists feel they're part of some, you know, team to convict somebody, and they're willing to literally, you know, stretch it beyond where they should go. We've seen it happen in a number of stories that I'm sure you're all aware of in West Virginia, Montana. There's a case that we cite here called Pierce v. Gilchrist out of the 10th Circuit involving the serologist in Oklahoma. These are people who simply fabricated evidence and failed to disclose exculpatory impeachment information just so an innocent person could get convicted. And that's what this civil rights lawsuit is about. And the last point I want to make is not just on the fabrication, but he also got the Brady law wrong. I don't know what the reason is. You know, some of us who have experiences in the criminal justice system think of Brady as the prosecutor's duty to disclose exculpatory or impeachment information. But in the civil rights lawsuit, it's different, because as you all know, the prosecutor enjoys immunity for what he does as a prosecutor during the prosecuting of the case. However, the police, through Carlsby Whitley, have a duty to turn over any exculpatory impeachment material to the D.A. so the D.A. can turn it over to the defense. Well, in this case, Miller had the obligation to see to it that the misinformation he had was turned over to the defense. Well, I think the law is, and correct me if I'm mistaken, is he has the obligation to turn it over to the prosecutor, and then the prosecutor turns it over to the defense. I think that's what the U.S. court said in Kyles. However, it really doesn't matter, I think, Your Honor, because what we're saying is that it never got to the prosecutor. And the only way we can — Isn't it a little different with the serologist who is an independent contractor as opposed to a State employee? No, no. The serologist here is not an independent contractor. He was an employee of the California Department of Justice Crime Laboratory, working in the same building as the Riverside County Sheriff's Department. And he is a criminalist at a local crime laboratory. He's not in private practice at all. So there's no question, by the way, there's a concession by the witness during the depositions that Grady applies to him, and that he knew his Grady obligation, and he knew it back in 1987 and 1988 when this case happened. So that's really not an issue here. But what is an issue, okay, is that the only way we can prevail as a plaintiff in a civil rights lawsuit is by showing that the criminalist or the officer did not turn over the information to the DA, because if they did that, they're home free. Okay? We may be angry with the prosecutor, but we don't have a civil rights lawsuit. But in this case, it's obvious, it is obvious that these two individuals did not disclose the exculpatory or impeachment information to the DA. Number one, you have the DA's summation at the trial and this letter in May of 2000 where he says, I relied on an explanation I got from the criminalist, okay, which we now know is false. So obviously he didn't tell the DA the truth. And that constitutes the Grady violation. We know when the DA sums up on how these sneakers matched, okay, it was very interesting how that was exploited at trial as well. Ordinarily, if you want to say, if you want to argue that these sneakers matched the ones that I saw the perpetrator wearing, you would have the victim identify them in the courtroom. That's the way it's been done for the last 25 years I've been practicing law. But here, Miller didn't do that. You had a DA who was inexperienced. He said it was his first-grade case. Here, Miller carries the sneakers into court, even though he admits in the deposition now that there is very compelling evidence that she didn't recognize the sneakers when he brought them to her and absolutely no evidence that he did. And nonetheless, he did something that is tricky and unusual and inappropriate. Namely, he on his own takes the sneakers out of a bag in front of the jury and says specifically, look at these sneakers that I found on Atkins when I arrested him in the jail. They're just like the sneakers that the victim described when she was raped. If that isn't causation, if that doesn't sort of, you know, jack up the misconduct of Miller and show his bad faith on everything else, I don't know what does. I reserve a few minutes if I can have it. Well, you have a little deficit, but that's the way the country runs, so don't worry. Thank you very much. Good morning. Chris Lockwood for the county and Captain Miller. I began my brief by pointing out that a large portion of the plaintiff's brief is not based on the record before you. That was the pattern in the trial court, and it happened again today. Is there any question in your mind about what Miller deliberately refused or failed to disclose required Brady material? Yes, a major question. Because what you just heard. He disclosed everything to the defense. Everything he knew about his investigation. Let me go through them one by one and tell you why. I think that's a bad question. Take that one. I do. You gave me an absolute, and I just give you an example. I know. Where I'm having difficulty. You don't want to explain it. No, I do want to. There are three things that are listed for Miller. The real record is not the record you've heard this morning, and it's not the record that's in the plaintiff's brief. I want to know what Miller disclosed and whether he disclosed everything. Is that your representation? The record is a little ambiguous as far as the shoes issue. I'm telling you what the record actually says. If you look at this one, and this is pages 171 through 173 of the appellee's exceptive record, there is no dispute that at the time that Miller was executing a search warrant at the jail, he saw shoes that were being worn by Mr. Atkins, and he sees them as being in plain sight. That's all undisputed in reports. What he did with them afterwards is something in which there just isn't any evidence. He was asked in deposition, and this is pages 171 through 173, why did you see them? And the answer was to show them to the victim. He thinks he shows them to her. Beyond that, he has no recall of what happened. There is no report. There is zero evidence that she ever saw them. How could that really be? You know, you take the shoes off a guy, and you think the victim described the same shoes, and then you don't remember whether you showed them to the victim or not. It was a 14-year gap is the problem. A 14-year gap? Well, did he make any notes about it? There is no record of what happened after that. There are three possibilities it could have happened. The record leaves open all three of them. One is she said these are the right shoes. The second is she said they're not. And the third was I don't know. The record doesn't indicate which of those. Nothing, there's no record of anything between those two and the trial. The trial testimony then, Miller is called by the prosecutor, and he simply testifies to what I just talked to you about what happened at the jailhouse. That's the end of it. He never says anything beyond that. Well, what the representation was made by your adversary that he was asked whether if the victim had that he stated that he took the shoes out to the victim, and that if the victim had identified them in his normal practice, he would have written it down in order. Let me get the actual record. Because there is a consistent divergence between the record and what's represented. The appellee's excerpt of record starting at page 171. Question. Would you agree that, what goes on here, would you agree that at a prior occasion, that you took from Mr. Atkins the shoes he was wearing? Is that correct? Answer. Yes. Question. And the reason you took those shoes is that, in your opinion, they resembled the shoes that were described to you by the victim. Is that right? Answer. Yes. And you took those shoes from him because you wanted to show them to the victim to see whether they were, in fact, the shoes. Correct. Answer.  Question. And the reason that you also now in this particular search warrant, that's a different subject here. Okay. The reason you also in this search warrant wanted to get the ring and the necklace and the pants is that you also wanted to have those items viewed by the victim. You're talking too fast for me. Sorry. Sorry. Just raise your voice. Sorry. Between you and other counsel, we're going to go to the extremes. I apologize. Go ahead. Anyway, going on. Question. That was the reason for securing these items. Yes. To show them to the victim. Question. Okay. Isn't it a fact that after you got these items from Mr. Atkins that you took them to Kelly and showed them to her for identification, as was your purpose when you secured them? Answer. Yes. Question. And when you showed her those items, she did not say that the shoes were worn or the same shoes that were worn by the perpetrator. Isn't that correct? Answer. That I don't recall. I don't recall specifically. Is there a report or something? Question. No. I'm asking to the best of your recollection right now. Isn't it a fact that she did not identify those shoes as having been worn by the perpetrator of the rape? Answer. I'm sorry. I don't remember. That's the evidence. What did you tell the prosecutor? He doesn't recall. Any record of that? 14 years later. Is there any record of what he told the prosecutor? No. No written report. There's a little bit about the shoes. And what came in the record on that one, maybe the pages on that one, the appellee's records, the record pages 121, 180, and 183. At the initial interview of the victim, there's a description of the shoes being Reebok. That's in the report. There's a later phone call from the victim in which she's saying what? Reebok brand. Reebok. Right. Oh, I thought you said rebarred. Oh, sorry. No. Reebok. Look at the microphone. Okay. She later called Captain Miller and told him that thinking about it some more, she thinks maybe they might have been a Stadia brand. That's also in the report. The reports were all given to the prosecutor, and the prosecutor gave them all to the defense attorney. That was all disclosed. So we have the shoes issue is ambiguous. But there is no evidence of a deliberate suppression of anything. It just doesn't exist. I want to back up on a few other issues before we get to that, though. The whole premise of the plaintiff's briefs and the argument today is that there is a constitutional right to have accurate identifications and a constitutional right to have material produced. That is not the right. There is no such separate right. Well, there is a right to a disclosure if there has been a fabrication. Not even that, actually. The right at issue is one to a fair trial. Those are aspects of the right to a fair trial. If you're disclosing the truth and you don't disclose something you know to be not the truth, is that not affecting the trial? I agree. I mean, you get a conviction on fraudulent evidence. For goodness sakes, that's affecting the trial. I agree with that completely. The point I'm making, though, is that the right at issue is to a fair trial overall. That's the right at issue. If the trial overall is fair and there's something which is a violation of one of these procedural rights. Brady is more a refinement of specific testimony and discovery and evidence than the whole trial. You examine the disclosure of an investigating officer. If that has any effect on the trial from nondisclosure, you're going to get a reversal. It's not the whole trial we're looking at. We're looking at the wrongdoing. But there are case after case after case finding that some evidence should have been disclosed under the Brady standard, but finding that harmless error. And I think that's the standard that has to be addressed here. Step back a little bit. We have two very solid identifications of witnesses in this case. Despite plaintiff's argument about that one, we have identification that same day, completely spontaneous, by the victim. We have a second identification the very next day, completely spontaneous, by someone else who had seen the rapist. Well, she was shown, what, a wanted poster, right? She was not shown anything. And that's also a misrepresentation of the rapist. How did she make the identification? She was taken to the station after being taken to the hospital and was shown a number of mug shots. And since she had mentioned that he was high school age, she was also shown some yearbooks from local high schools. She mentioned two people being somewhat similar. They weren't the right ones, but they were somewhat the same build. Captain Miller decided to run them anyway just to see. And while he was doing that, he kind of parked her in their briefing room. So it's a nice place to wait with her, the victim, and her mother. He came back five to ten minutes later. This is undisputed. He walked in, and the L.A. County wanted poster was lying on the table in the briefing room, which he didn't know. He walked in, and she says, that's him on the poster. She was positive about it, and her testimony is completely undisputed about that one. Captain Miller thought it was possibly coincidental and did a few things in response. I'll get a second one. First thing, though, because he's very positive. Where was it? It was not quite in that room. It was in the briefing room. It was in the briefing room. So it was just sitting there. Right. This was a surprise to everybody. Not a surprise, but go ahead. Captain Miller put together an internal flyer for other officers. And if you look at it, it actually says it there. It discloses what I just told you. It says on itself. It was an internal flyer for use within the department. The very next day, the department got a call from a different shopping center about ten miles away. Somebody had seen somebody suspicious and thought it might be the rapist had been reported. So Deputy Nash, the former party, went out there. He took the flyer and showed the person who had called in, and she said, no, that's not him. Little dispute about what happened at this point. But while he's talking to him, the witness who had been in the store right next door to where the rape occurred, and who had seen the rapist about an hour beforehand, walked up to the deputy to ask if they'd caught him, looked over his shoulder, saw the flyer and said, that's him. Once again, a completely spontaneous identification. Captain Miller put together a 12-photo array for both of them to make sure they're really serious about this. Both of them had no problem picking him out as the person. We have two very solid identifications. Both of these were explored fully at trial. The trial court found admissible. The court of appeal found admissible. And they had the same photograph that was on the wanted poster, right? That's true. It was actually a better quality picture, but yes. Yeah, the same picture, yeah. The evidence on that one is that he called the name of the detective on the poster asking for another photograph, and ended up being sent the same one. That's the only one he ever had to work with. And there is no evidence that there was any source he could have gotten any other photograph to begin with. He did the best he could. But we do have very solid identifications on both of these. By themselves, that's enough for a conviction. If you look at the context of the entire trial, this issue of the shoes is a one-page issue out of the entire transcript, a very minor part of what the evidence was in the case. That's why I think the real issue on this one is only that. That might be enough for conviction, the two identifications. But if the victim, if he had said, now, these are the shoes that the defendant was wearing when we arrested him, and the victim can't identify him, then the jury might start to think, well, maybe those two identifications aren't it. I think it's important to look at the context of the arrest as well. If he had been arrested an hour or two later, and he's wearing different shoes, that's significant. The arrest happened about three months later in a different State. So the fact that he's wearing different clothes proves nothing. All that happens if you take the shoes out is you've removed that evidence. Why were the shoes introduced if it's three months later and he's wearing different ones? The prosecutor himself can't recall much about this, and Captain Miller can't either. Looking at the trial, I agree it was a strange way this was done. The evidence from Captain Miller testifying is that he went to the Los Angeles County Jail, saw the shoes, and seized them. He then testified, and they're in the bag right here, and they resembled the ones the victim described. Testimony stops there. The next thing that should have happened with the prosecutor is to show them to the victim. He didn't do that, and the defense attorney didn't do anything about it either. It was a strange way it was done, but it's not Captain Miller's fault. But as far as the ‑‑ if you take the shoes out of the equation, because that's the only effect, assuming there had been everything Plaintiff says, the only effect of all that would be remove the shoes from the equation. You still got two very solid witness identifications. Are you going to speak about the serology? That's my co‑defendant over here. It's not mine at all. No, you only got six minutes left, you know. Excuse me? You've been talking now for ‑‑ Have I? Sorry. 14 minutes. 14 minutes. I mean, we've been talking about shoes. I was trying to answer the questions you asked. It is starting, so thank you. All right. Good morning. Paul Epstein for Defendant James Hall. I first want to address a few points that were made by Mr. Neufeld. First of all, the fact that Mr. Atkins was exonerated is completely irrelevant to the question of whether Mr. Hall committed any acts that caused a deprivation of his right to due process in 1988. Secondly, as I understood Mr. Neufeld, he stated that Hall has admitted that he told the prosecutor that only 95% of the people could be excluded but not Mr. Atkins. That's absolutely false. In fact, it's exactly the opposite. Mr. Atkins admitted in interrogatory responses that what Mr. Hall told Mr. Bentley was accurate. And that is in the record in Apelli's joint excerpts of record at page 697. It's probably a good time for me to refer to this notorious chart. And this is in the joint excerpts of record at 786. I enlarged it a bit, hoping the Court could see it. This is the chart that was, that Mr. Hall prepared at the request of Mr. Bentley and that was shown to him before trial. What it shows is the population, the percentage of the African-American and Caucasian populations who have type A blood, PGM 2 plus 1 plus, and are secretors. And the way you get the 6.1 percent is you multiply the respective percentages, because in essence, those are probabilities. And it's all irrelevant, is that right? It is irrelevant, but it's true. It's true. In other words, boy, the defendant, the kind of blood the defendant had is only possessed by 1 percent of the population. But, of course, that has nothing to do with this case. That's right. I absolutely agree with you. It's irrelevant. I just wanted to make the point. I don't think it's at all misleading. You don't think it likely led to the kind of an argument that was made by the prosecutor? No, I wouldn't. I wouldn't deny that it very well could have led to the argument that the prosecutor made. However, Mr. Hall is not responsible for that, because he testified to exactly what is on this chart at his trial. He never wrote on here that Mr. Adkins was part of only 5 percent of the population who can't be excluded, nor did he ever testify to that. He testified to this information at trial under questioning by the prosecutor. Granted, it's irrelevant, but it is not false information. And most importantly, he has absolute testimonial immunity for what he testified to at trial. That immunity is completely abrogated if you say, well, because he wrote the same information out on a piece of paper before trial, he's not entitled to immunity. Well, if he knew it was worthless, he knew it was worthless, why didn't he tell that to the prosecutor? The prosecutor requested the information. He was trying to assist him. I can't tell you. But, I mean, you say, here it is, but, you know, it's worthless. It doesn't mean anything. What are you going to do with it? Well, I'm going to make an argument. You know, he's part of that 4 percent. 6 percent. 6 percent. Mr. Hall had no idea he was going to make the argument. And again, I'd like the Court to focus on the fact that he was asked by the prosecutor to do it. He may have thought the prosecutor wanted it as background information. They have no evidence that this was prepared with a deliberate intent of misleading Mr. Bentley. And I'd like to again emphasize that. But the inference can be drawn, can't it? I don't think so. Why not? Because he wrote a chart with truthful information. That means he intended to mislead. With truthful information that he knew was involved in a criminal prosecution. And the prosecutor wanted it. And the prosecutor, you know, just didn't want it to hang on his, you know, wall or he was going to use it in the trial. Well, let's look at it this way. If this chart. That's the wrong way of looking at it. Yes. So that's an inference. I don't think it's an inference of bad faith at all. Well, that's for the jury to decide, isn't it? I don't think so. There's, you know, he, Mr. Neufeld mentioned Miller v. Pate. That's completely irrelevant because there the government admitted that the evidence had been fabricated. So that doesn't provide any support in this case for their argument. But I'd like to emphasize again the testimonial immunity issue. If Mr. Hall had never prepared this chart but had simply testified to this information at trial, which he did do, there would be no question he's entitled to testimonial immunity, whether it's true or false or misleading. The fact that he also wrote this before trial should not take away the testimonial immunity because it simply aggregates the immunity if what you say in trial, the And I think this, that argument is supported by the Franklin v. Turr case. Essentially what they're arguing is a conspiracy to provide perjured testimony. And Franklin v. Turr says that that is. I haven't heard that. Well. I haven't heard that argument. Well, let's put it this way, Your Honor. If Mr. Bentley and Mr. Hall had actually conspired to provide the testimony through Mr. Hall, that Mr. Atkins was part of only 5 percent of the population who couldn't be excluded, that would clearly be a conspiracy. And under Franklin v. Turr and the Malbrae case that I cited in my supplemental brief from the Fifth Circuit, that would be protected by the testimonial immunity. So how can we hold Mr. Hall liable for behavior which is not nearly as egregious as a conspiracy to provide perjured testimony? Arguably, it's no more than negligence. Did Hall, is there any evidence that Hall advised the prosecutor that whole groups of sperm donors could be excluded? No, there isn't. There's no evidence of that. There is no evidence of that. They have three claims, the pubic hair, the Brady claim, and what we've just been talking about, the char. I think that the Court should focus on the fact that this is what Mr. Hall testified to at trial. It's therefore protected by absolute testimonial immunity, regardless of the fact that he wrote out the same testimony before he testified. And again, I rely on Franklin v. Turr and the Malbrae case that I cited in my supplemental brief. Just to remind you of the facts of Malbrae, in that case, the issue was whether a nightgown had blood on it. And the laboratory technician performed several luminal tests. Some were negative. Some were positive for blood. The fact that there were negative tests would have been — would have aided the defendant. He only reported the positive test to the prosecutor. That was all that was reported to the defense attorney. And he only testified to the positive tests at trial. The plaintiff in the civil case claimed, well, you suppressed the fact that there were negative luminal tests. And the Court said, maybe so, however, he's protected by the absolute testimonial immunity, because that's the very thing he testified to at trial. So under either Franklin v. Turr or Malbrae, this chart cannot be the basis for a claim against Mr. Hall because it's covered by the testimonial immunity. He testified to the very same thing at Mr. Atkins' trial. And that is undisputed, and we've cited in our brief where Mr. Hall's testimony can be found. I just want to emphasize this because I think it's a little unclear. At times in this case, the appellant has said, well, Mr. Hall actually told Mr. Bentley that only 5 percent of the people, 5 percent cannot be excluded, and that includes Mr. Atkins. At other times he said, well, yes, you provided the information that's on this chart and it's true, but it's irrelevant, and therefore it violated my right. What do we do with the prosecutor's letter? Excuse me, Your Honor? What do we do with the prosecutor's letter saying that, you know, he was told by Hall at 90 percent? First of all, he denied under oath in his deposition that he was ever told that by Mr. Hall. Mr. Neufeld asked him the question in about 15 different ways, and he said, Mr. Hall never told me that. I wonder if the letter doesn't raise a factual question on whether he was told or not. I don't think it does raise a factual question because, again, I get back to testimonial immunity. If Mr. Hall had actually said that to Mr. Bentley and there had been a conspiracy to provide the information at trial that Mr. Atkins was part of this small group who couldn't be excluded, that's covered by testimonial immunity. Even if he doesn't testify to it. That's your theory, right? No, if he does testify to it. Oh, you said he didn't testify that 95 percent is excludable. Right. Exactly. But what if he told the prosecutor that they were? And then didn't testify to that. But the prosecutor argued it. I think there's Franklin v. Chur could apply, but that specific issue was not decided by Franklin v. Chur. However, it's not — there's no dispute. Mr. Hall did not testify that Mr. Atkins was part of only 5 percent who could not be excluded. I understand that. He did not testify. He testified to what's on the chart and, therefore, there's no question that testimonial immunity protects him. He also testified that the blood activity detected could have come from the victim, from Mr. Atkins, or from both of them. So everything he said was truthful. Let me just briefly go over the claims. First of all, as to the Brady claim, the evidence that they claim was suppressed and was exculpatory was neither suppressed or exculpatory. And the best evidence for that is the fact that Mr. Atkins' lawyer argued to the jury in closing argument that Mr. Hall's serology results excluded no one. That's exactly the fact that Mr. Atkins and Dr. Blake says was suppressed. How could it have been suppressed if Mr. Hall's lawyer argued it to the jury? Secondly, it's not exculpatory. The fact that Mr. Atkins could not be excluded, no one could be excluded, does not tend to clear him of guilt. And that's the definition in Blacks of exculpatory. So even if it was – even if it's accepted that there might have been some suppression, it doesn't matter because it's not exculpatory evidence. If you tell the jury this serology evidence proves nothing one way or the other about whether Mr. Atkins committed the crime, how can that possibly cause them to be more likely to acquit him? It can't, especially coupled with the fact of the other evidence against Mr. Atkins, the two eyewitnesses and the clothing. Kennedy. Now, we're way over time, see. Six minutes so far. You had 12 minutes. Mr. Lockwood took a little longer. Could I – Well, you have to take it up with him, you know. You had 20 to split. You've gotten more than half of it already. So why don't you just wrap it up? Okay. With respect to the pubic hair. It's not that we're trying to rush you, but, you know, we've got another – I understand. We've got a lot of people waiting for the turn here. I understand. With respect to the pubic hair, the only way they could prevail on this claim is to show both that Mr. Hall found the hair, knew it was exculpatory, and refused to test it or dispose of it in bad faith. They have no evidence of any of that. Mr. Hall testified – What happened to it? Mr. Hall testified that the hair was not on the sweater when he opened the package. Now, even granting that there could be a triable issue of fact about that, they have no evidence of what happened after that. Under the Youngblood case, Mr. Atkins has no constitutional right to have any particular piece of evidence tested. When the police put that sweater in the bag, there was hair on there. Your Honor, I'm willing to accept that there could be a triable issue, that the hair might have been on the sweater when he opened it, and he just didn't see it. But they cannot prove that he knew it was exculpatory and that he refused to test it because he knew it would exculpate Mr. Atkins. That's what they have to prove under Youngblood to show a due process violation on Mr. Hall's part. They can't do that. All they want to do is argue to the jury, well, Mr. Hall must have refused to test it in bad faith because he knew that hair evidence was exculpatory. Well, didn't – wasn't he told when he got that bag that there's hair in there? Yes. It was on the slip that traveled with the bag. Okay. So he didn't find the hair? Well, even if he did or even if he – I don't know. I mean, it's a little crazy, isn't it? Not necessarily. I mean, hair is important. Hair is a fragile thing. Even if he did find it, there's no liability under Youngblood unless they can show he knew it was exculpatory and failed to test it. They can't possibly show that. If they had any of that evidence, they would have offered it in opposition to summary judgment. Sure. They'd have inference that if it's in there and – Well, that would be exactly the opposite of what Youngblood held. If you say the fact that testing it could be exculpatory, you're concluding exactly the opposite of what Youngblood – Well, listen, it gives the public confidence in the, you know, investigative procedures carried out in these labs. I don't know that that's an issue. The issue here is – I don't know about an issue, but you just kind of wonder what's going on. Mistakes are made. But the law in this case is that they have to prove bad faith, and they can't do it because Youngblood says the mere fact he failed to test is not evidence of bad faith. Thank you. Anything else?  Okay. I'm mindful that a crook is about to pull me off by the neck. I wish to just make three very brief points. The first one takes one minute longer only because when my adversary was quoting from the record on the Miller sneakers issue, he stopped the quote when it got to the most important part. I call the Court's attention to the record at 633, and the testimony is on page 187 of the deposition. The last question and answer he gave you when he read from the record was, question, no, I'm asking to the best of your recollection right now, isn't it a fact that she did not identify those shoes as having been worn by the perpetrator of the rape? Answer, I'm sorry, I don't remember. That's where he cut it off. Here's where it goes after that. Question, now, if in fact given your practice and what you know of what you did, if in fact she had affirmatively identified those sneakers, that would be considered a material part of your investigation, correct? Answer, yes, and the shoes would have been booked into evidence. Question, and you would have, but you would have also made a report describing how she affirmatively identified the shoes, much the way she affirmatively identified him, correct? Answer, by Miller, yes. Question, and if she had identified the ring as the ring worn by the perpetrator, you would have also included that in the report, correct? Answer, yes. Question, and if she had identified the necklace as being worn by the perpetrator, you would have included that in the report, correct? Answer, yes. Question, and the same for the pants? Right, answer yes. Question, and if in fact there is no report that she did identify those four items, or any of those items, as belonging to the perpetrator, then that would be evidence to you, would it not, that when you showed her those items she failed to identify them as such, correct? Answer, yes. So he even acknowledged that given his practice, that he would have written it down if it helped. And the fact that he didn't write it down, he even acknowledged as evidence that it wasn't helpful when he showed those items. That's the only point I want to make about Miller. Now I'd like to make two points about Hall. Counsel is misstating the significance of young blood. It's an either-or situation. The hair was there. If he, and there's no question since we now know, and this is the beauty of DNA testing, we now know that Herman Atkins wasn't there and it wasn't his hair. Then given the fact that the serology was completely uninformative and not inculpatory, the hair comparison was the best chance to completely exonerate him and not make him have to go through trial. There's no question that hair was there. And by the way, he says I didn't see a hair. But you can't say that it was exculpatory because of what we know now. Well, that's interesting. We know it wasn't his hair. That we know. And we do know that hair microscopy, as we have an expert's report in this case. But we didn't know then that it wasn't his hair. I'm sorry, what? We didn't. Hall couldn't have known it wasn't his hair. That's true. And I'm not sure when I read Youngblood if it means that at that particular moment he had to specifically know that. Because I thought when the decision was written in Youngblood, they didn't know on the serology what would have happened. They don't even know that 10 years later. But we do know that it was, in fact, exculpatory. But let's accept for the moment that we take the bad faith approach. So if you don't know it was exculpatory, then there's a requirement of bad faith. Not intentionally destroying it, but bad faith. And what we're saying is that either he deliberately failed to test it, okay, or that somehow it got destroyed. And where is our evidence of bad faith? Our evidence of bad faith is, one, that he didn't note anywhere that there was no hair on the sweater, despite the fact that he was instructed to examine the hair on the sweater. Whereas for all the other items he looked at, he noted when there was no hair. So I don't think any jury has to believe his 14-year-later remark that I didn't see a hair there, number one. Number two, we do know now that he fabricated the serology evidence. And that he failed to disclose Brady material about the serology evidence. So we see a person here who is willing to falsely implicate someone else. And a jury is free to consider that evidence about the serology fabrication in assessing his bad faith with respect to the hair. And we're entitled to that inference, at least in front of a jury. The third thing I want to simply say is, in response to a question that you asked at posting council, Your Honor, is of course there's evidence that he falsely represented the blood groups who could have been included as possible donors to that semen. Number one, you have the report itself. In the actual report that's given to the district attorney one year in advance, he says in addition to Mr. Atkins being included, the people who are ABO non-secretives could be included. ABO non-secretives are approximately 20% of the population. So in that sentence, he is not including as possible contributors type A secretors, type B secretors, type AB secretors, and type O secretors. Okay? An overwhelming majority of the population. So in answer to your question, he did explicitly do that in a report he delivered to the DA one year before trial. And two, with respect to the report and that chart, like you said, the only statistic that's relevant in a sexual assault case is the group of potential semen donors. He's an experienced serologist. He's been doing this for years for the government in California. And he knows that. His bosses all testified that he knew that. And so when he gives this statistic at a meeting with the DA, when the DA is sitting down with him to try and understand what is the significance of the serology evidence, how can I use it, okay? And he says, look, here's this chart I prepared for you. Only 4.4% of the black population has this type. Only 6% of the white population has that type. That's the second fabrication. And neither of those fabrications are protected by testimonial immunity. This court decided Payne versus the city of Lompoc and said that whereas the actual testimony at trial is certainly immune, those pretrial meetings with the district attorney are not. And it has to be that way, because otherwise a police officer could plant a gun and fabricate evidence and then insulate himself by simply going to court and describing how he found the gun on the accused. That can't be the purpose of immunity. Immunity is supposed to carve out a narrow exception. Here it would completely swallow the rule. Thank you. Does the Court have any questions about the Rule 28 submissions? No. Okay. No, we're fine. Thank you. Thank you. No. All right, we'll go to the next matter.
judges: Pregerson, Canby, Beezer